# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEBRASKA

In re:                                                                    Chapter 11

Skyline Manor, Inc.,                                            Case No. 14-80934

    Debtor.

_____/

## MOTION TO APPOINT CHAPTER 11 TRUSTEE

    Oxford Finance LLC ("Oxford"), by and through its counsel, hereby moves (this "Motion") for the appointment of a chapter 11 trustee for the above-captioned debtor and debtor-in-possession, Skyline Manor, Inc. ("Skyline"). In support of this Motion, Oxford respectfully states as follows:

### PRELIMINARY STATEMENT

    1.    Skyline is a Nebraska non-profit corporation that operates a 199 unit continuing care retirement community and a 140 unit independent living facility in Omaha (together, the "Healthcare Facility"). Oxford is Skyline's senior secured lender and has liens on all of Skyline's real and personal property.

    2.    Skyline's board of directors appointed Mr. John Bartle to serve as Skyline's chief restructuring officer on October 16, 2009. Throughout the life of Oxford's loan with Skyline, Skyline's board of directors has been unresponsive to Oxford. Mr. Bartle has handled all communications between Skyline and Oxford.

    3.    Through this Motion, Oxford seeks appointment of a chapter 11 trustee for Skyline to ensure honest, competent and proper management of Skyline. Cause exists for the appointment of a chapter 11 trustee because neither Skyline, Mr. John Bartle, nor Skyline's board of directors, can be trusted to carry out the debtor's fiduciary duties in this case. Skyline

1

has been in default under its loans with Oxford for over a year. Despite Oxford's attempts to find a resolution with Skyline during this time, Skyline and Mr. Bartle have admitted to intentionally diverting Oxford's collateral and have refused to disclose Skyline's books and records to Oxford – an obligation that is required under its loan agreements and an act which, upon information and belief of an independent auditor, was meant to preclude Oxford from detecting the extent of Skyline's diversion of funds and accounting deficiencies. Skyline and Mr. Bartle also refused to recognize Oxford's direction to appoint an independent manager, a remedy provided for under the loan documents.[1]

4. In addition to the dishonest, incompetent and improper management of Skyline observed by Oxford, there are numerous lawsuits across the country alleging similar allegations against Skyline, members of Skyline's board of directors and Mr. Bartle.

5. In a lawsuit brought by one of Skyline's directors against the other Skyline directors, it is alleged that Mr. Bartle included his family members and their related businesses on Skyline's payroll. There are allegations and findings against Mr. Bartle for diverting funds between his numerous related entities (which, according to one court, number over 83) and using funds from his entities to make payments for his family members. In past litigation with the United States, Mr. Bartle was found, by the United States District Court for the Southern District of Indiana, to have submitted false financial oaths to the United States resulting in concealment of over $1 million of his income.

6. Mr. Bartle has not only put the well-being of the residents of the Healthcare Facility at risk by his financial mismanagement, he has also put them at risk by failing to comply

---

[1] Skyline's attempts to conceal its books, records and operations is further evidenced by its failure to check the box on its bankruptcy petition that it is a healthcare business, which disclosure triggers the court's appointment of a patient care ombudsman under 11 U.S.C. § 333.

with the Nebraska Department of Health regulations. Just last December, Skyline's license to operate the Healthcare Facility was scheduled to be revoked and Skyline remains on probationary status with the Nebraska Department of Health.

7. Mr. Bartle's dishonest, incompetent and improper management of Skyline evidenced by his dealings with Oxford, his history of dishonesty with the courts and the United States, his mismanagement of the Healthcare Facility and the dispute amongst Skyline's board of directors – singularly and in the aggregate constitute "cause" within the meaning of § 1104(a)(1), mandating the appointment of a chapter 11 trustee.

8. Each of these acts also provide cause for appointment of an independent trustee pursuant to § 1104(a)(1). In the aggregate, they display a pattern of behavior that is incompatible with the duties of a fiduciary to the creditors of Skyline's estate and the residents of the Healthcare Facility and there is simply no reason to believe that Skyline or Mr. Bartle's attitude has changed or will change by virtue of the filing of this chapter 11 case. Accordingly, the practical realities and necessities dictate that the Court, pursuant to section 1104(a)(2), appoint an independent trustee to protect Skyline's creditors, residents of the Healthcare Facility and the other interests of the estate, as well as preserve the integrity of the chapter 11 process in which trustworthiness and transparency are paramount.

9. Skyline is a non-profit corporation. Neither its absentee board nor Mr. Bartle have an economic interest in Skyline and, under the allegations set forth herein, both should cede management and control of Skyline to a neutral third party. It is difficult to understand any resistance to the appointment of a chapter 11 trustee by Mr. Bartle or the board, unless of course, it is an attempt to conceal wrongdoing.

**JURISDICTION AND VENUE**

10. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

11. The statutory predicate for the relief requested herein is section 1104(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code").

**BACKGROUND**

**A.   SKYLINE'S MANAGEMENT.**

12. Mr. Bartle is the chief restructuring officer of Skyline and has handled almost all, if not all, communication between Oxford and Skyline throughout the life of the loans. (Skyline Corporate Resolution, Dckt. No. 4; Affidavit of Joseph Somerset ¶ 5, filed contemporaneously herewith.) Oxford provided notices regarding the loans to the chairman of Skyline's board or directors, Mr. Robert Rynard, but Mr. Rynard has never responded to Oxford's communications. (Somerset Aff. ¶ 5.) The only time Oxford spoke to Mr. Rynard, he told Oxford that Mr. Bartle "handles everything" with respect to Skyline.

13. From the time the loans were made until recently, Americare Communities III, LLC managed Skyline's operations. (Management Agreement, Exhibit A; Letter from J. Bartle 5/5/14, Exhibit B.) Mr. Bartle is affiliated with Americare. (*See* Management Agreement, Exhibit A, signed by Mr. Bartle on behalf of Americare.) Upon information and belief, Mr. Bartle is also affiliated with various other entities, including BVM Management. (*See* Bartle Email 5/5/14, Exhibit B, Mr. Bartle's signature line states "John Bartle, Americare Partners, a BVM Management affiliate"; and *Lock Realty Corp. IX v. U.S. Health, LP*, 2006 U.S. Dist. LEXIS 73498 *8 (N.D. Ind. Sept. 25, 2006), Exhibit C (stating that Mr. Bartle has over 83 related entities).

14.     On May 5, 2014, Mr. Bartle informed Oxford that Americare had been "voluntarily" terminated and the "Officers" were managing Skyline.  (Bartle Email 5/5/14, Exhibit B.)  However, following the filing of this chapter 11 case, Mr. Bartle sent a letter to Oxford indicating that Americare may again be managing Skyline.  (Bartle Email 5/10/14, Exhibit HH.)  As of the date of this filing, it is unclear to Oxford whether Americare is again managing the Healthcare Facility or whether the "Officers" are managing it.  (Somerset Aff. ¶ 44.)

15.     Upon information and belief, all of Skyline's books and records are kept internally and an independent accountant is not used.  (Somerset Aff. ¶ 8.)  Mr. Bartle informed Oxford's independent auditor that Dana Wadman-Huth is Skyline's outside accountant, however, according to the Nebraska Secretary of State filings, Ms. Wadman-Huth is the secretary, treasurer and a board member of Skyline and she uses a mailing address for BVM Management, Inc. (Affidavit of Martin Munson, filed contemporaneously herewith, ¶ 10; Nebraska Secretary of State Report as of May 10, 2014, Exhibit D.)

**B.     SKYLINE'S DEFAULTS UNDER ITS LOANS FROM OXFORD.**

16.     In 2011, pursuant to a revolving facility and a term loan, Oxford provided Skyline $11 million in loans.[2]  Oxford's loans to Skyline are secured by liens on all of Skyline's personal and real property.[3]

---

[2] *See* Credit and Security Agreement dated as of October 28, 2011 (as amended, restated, supplemented, or otherwise modified from time to time, the "Revolving Credit Agreement", Exhibit E); Term Loan and Security Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Term Loan Agreement", Exhibit F) and Amendment and Forbearance Agreement dated as of November 20, 2013 (the "Forbearance Agreement", Exhibit G, the Forbearance Agreement, the Term Loan Agreement and the Revolving Credit Agreement together shall be referred to as, the "Loan Agreements").

[3] *See* Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of October 28, 2011 (as amended, restated, supplemented, or otherwise modified from time to time, the "Revolving Security Agreement", Exhibit H), properly recorded with Register of Deeds, Douglas County, Nebraska on October 28, 2011, as No. 2011092244 and a UCC financing statement was properly filed with the Nebraska Secretary of State on October 11, 2011 as No. 9911674857-9 and Deed of Trust, Assignment of Rents and Leases, Security Agreement

5

17. Just over a year after the loans were made, Skyline defaulted on its obligations under the Loan Agreements. The defaults progressed from missed financial covenants and delinquent reporting to missed principal and interest payments and eventually to intentional diversion of Oxford's collateral. (Oxford's Default Letter 10/2/13, Exhibit J.)

18. In October 2013, Mr. Bartle, admitted that Skyline had been diverting funds from Oxford in direct contravention of the Loan Agreements to the tune of approximately $758,000 per month from April 2013 to October 2013. (Somerset Aff. ¶¶ 15-17.) When Oxford's in-house legal counsel, Mr. John Toufanian, asked Mr. Bartle why Skyline was diverting the funds, Mr. Bartle responded, "So what … go seek your remedies." (Somerset Aff. ¶ 19.) Mr. Toufanian confirmed this conversation in writing to Mr. Bartle, counsel for Skyline, Mr. Dane Starbuck, and the president and chairman of Skyline's board of directors, Mr. Rynard. (Oxford Email 10/22/13, Exhibit K.)

19. Following Mr. Bartle's admitted diversion of funds, Oxford exercised its rights under the Loan Agreements and requested an inspection of its collateral and Skyline's books and records. (Oxford Letter 10/23/13, Exhibit L; Oxford Letter 11/1/13, Exhibit M.)

**C.   SKYLINE'S CONCEALMENT OF ITS BOOKS, RECORDS AND OPERATIONS.**

20. In what later became a pattern of conduct, Mr. Bartle refused to allow Oxford's auditors access to conduct the audit and threatened that Skyline would not do so until a forbearance or loan modification agreement was executed by the parties. (Skyline Email 11/1/13, Exhibit N.)

---

and Fixture Filing dated as of October 28, 2011 (as amended, restated, supplemented, or otherwise modified from time to time, the "Term Security Agreement", Exhibit I), properly recorded with Register of Deeds, Douglas County, Nebraska on October 28, 2011, No. 2011092243 and a UCC financing statement was properly filed with the Nebraska Secretary of State on October 21, 2011, No. 9911674858-1.

6

21. After another month of missed loan payments by Skyline, Oxford was forced to further exercise its rights under the Loan Agreements to gain transparency in Skyline's books and records. Oxford directed Skyline to terminate its manager, Americare Communities III, LLC, and to replace Americare with an independent manager. (Oxford Letter 11/4/13, Exhibit O.; Management Agreement, Exhibit A; and Assignment of Management Agreement and Subordination of Management Fees Agreement, Exhibit P.)

22. Skyline again refused to recognize Oxford's rights under the Loan Agreements and, on November 5, 2013, Mr. Bartle told Oxford that Skyline considered the Loan Agreements "cancelled" and that notices sent by Oxford under the Loan Agreements "will not be recognized, including the notice of termination of the management agreement." (Skyline Email 11/5/13, Exhibit Q.)

23. Based upon these events of default, Oxford accelerated the maturity date of the loans. (Oxford Letter 11/12/13, Exhibit R.)

D. **SCHEDULED REVOCATION OF SKYLINE'S LICENSE.**

24. Not only was Skyline in default on its loan obligations to Oxford and admittedly diverting Oxford's collateral, Skyline's license to operate the Healthcare Facility was scheduled to be revoked.

25. The Nebraska Department of Health advised Oxford that it had conducted two consecutive clinical surveys at the facility, and the results of both surveys included deficiencies that were well in excess of what the state considers to be acceptable. (Somerset Aff. ¶¶ 28-30.) Skyline failed to correct violations related to: (i) an infection control program to prevent cross-contamination, (ii) care with respect and dignity, and (iii) nutritious meals. (Department of Health and Human Services, Division of Public Health, Licensure Unit, Disciplinary Action Notices, September 1, 2013 to September 30, 2013, a copy of which is attached hereto as Exhibit

7

S.) And, as a result, the Nebraska Department of Health advised Oxford that Skyline would be decertified under the Medicare and Medicaid programs on December 6, 2013 and Skyline's license to operate the Healthcare Facility was scheduled to be revoked on January 5, 2014. (Somerset Aff. ¶ 30.)

26. As a consequence of the imminent threat to the residents of the Healthcare Facility by the scheduled license revocation, Skyline's admitted intentional diversion of Oxford's collateral, Skyline's concealment of its operations, books and records, and numerous other defaults under the Loan Agreements, Oxford filed an action to appoint a receiver over Skyline and for a temporary restraining order in the United States District Court for the District of Nebraska (No. 8:13-cv-336). (Motion to Appoint Receiver, Exhibit T; related pleadings available on electronic docket for Case No. 13-cv-336 (D. Neb.).)

27. A mere few hours after Oxford notified Skyline of the filing of the receivership action, Skyline filed a retaliatory complaint in the District Court of Douglas County, Nebraska (Case No. D01C1130009486) alleging that, even though Skyline agreed to these very remedies in the Loan Agreements, Oxford's requests for audits were "harassment" and Oxford's charging of default interest was "interfering with its business relations." (Complaint, Exhibit U.) The state court action was immediately removed to the District Court (Case No. 9:13-cv-00338).

28. In another attempt by Oxford to find resolution with Skyline, Oxford and Skyline executed a forbearance agreement and dismissed Oxford's receivership action and the removed state court action, without prejudice and before a hearing was held thereon. Entry into the forbearance agreement was a good faith effort by Oxford to find resolution with Skyline.

E. **SKYLINE'S ADMISSION OF DIVERSION AND DEFAULT.**

29. Within the Forbearance Agreement, Skyline admitted to diverting Oxford's collateral, refusing to recognize Oxford's appointment of a new manager and preventing Oxford

8

from conducting an audit of Skyline's books and records. (Forbearance Agreement ¶ 1(a) & (c), Exhibit G.)

30. Based upon Mr. Bartle's representations that the modified payment amounts and payment schedule would allow Skyline to revert to compliance under the Loan Agreements, Oxford agreed to Mr. Bartle's proposal. (Somerset Aff. ¶ 32.) Skyline further agreed under the Forbearance Agreement to allow Oxford to conduct an audit of Skyline by March 31, 2014. (Forbearance Agreement ¶ 4(a)(ii), Exhibit G).

**F.    SKYLINE'S CONTINUED COURSE OF DEFAULT.**

31. Unfortunately, despite Mr. Bartle's representations and the parties' agreement, Skyline defaulted on its very first payment due under the Forbearance Agreement and continued course in line with its previous behavior. (Oxford Default Letter 12/3/13, Exhibit V.)

32. Skyline failed to make its loan payments for January, February, March, April and May 2014. (Oxford Default Letters 2/10/14, 4/11/14 and 4/24/14, Exhibits W, X, and Y.) When Skyline finally sent a partial payment, via a check from Americare (Skyline's manager) to Oxford in April 2014, it bounced. (Somerset Aff. ¶ 37.) Then, only a partial payment was made, this time via a check from BVM Management, Inc. (Somerset Aff. ¶ 37.) As mentioned above, BVM and Americare are both part of Mr. Bartle's web of related entities.

33. Oxford was again forced by Skyline to renew its efforts to gain transparency into Skyline's operations. Oxford directed Skyline to appoint a new manager to replace Americare in April 2014. (Oxford Default Letter 4/11/14, Exhibit X.) Initially, Mr. Bartle told Oxford that Skyline's management would not change. (Bartle Email 4/11/14, Exhibit Z.) Later he informed Oxford that the manager had been "voluntarily" terminated and the "Officers" were managing Skyline. (Bartle Email 5/5/14, Exhibit B.) Skyline's "voluntary" termination of the manager was, yet another, violation of the Loan Agreements. (Revolving Credit Agreement § 11.10(a),

9

Exhibit E.) Following the filing of this chapter 11 case, Mr. Bartle informed Oxford that all of his previous offers to refrain from paying management fees were "rescinded." (Bartle Email 5/10/14, Exhibit HH.) It is unclear whether this means that Americare is again managing the Healthcare Facility or whether the "officers" are managing it. (Somerset Aff. ¶ 44.)

34. It was also discovered during this course of correspondence that Skyline had been paying its management fees to Americare (which was not only the manager, but also one of Mr. Bartle's entities) in violation of the Loan Agreements. (Assignment of Management Agreement and Subordination of Fees, Exhibit P; Starbuck Letter 5/2/14, Exhibit AA; Ottaviano Letter 5/5/14, Exhibit BB.)

35. Oxford engaged Watermark Advisory Group, LLC to conduct the audit agreed upon in the Forbearance Agreement. However, Skyline was, once again, uncooperative in the audit process. (Munson Aff. ¶ 11.) As a result, the audit took twice as long as it should have. (Munson Aff. ¶ 11.) And, in the end, the audit could not be completed because Skyline failed to provide the auditor with documents in response to routine requests, including Skyline's general ledger and bank statements supporting its accounts receivable collections for the fourth quarter of 2013. (Munson Aff. ¶ 12.)

36. From the records provided, the auditor found substantial discrepancies. (Munson Aff. ¶ 13.) For example, from his review of Skyline's records, the auditor observed that during the first three quarters of 2013, Skyline was receiving all of its accounts receivable reimbursements into one of its three bank accounts. (Munson Aff. ¶ 13.) But, throughout the fourth quarter of 2013 and continuing thereafter, there was no evidence that Skyline was receiving any of its non-government accounts receivable reimbursements into any of these three accounts. (Munson Aff. ¶ 14.) The missing funds amounted to approximately 60% of Skyline's

10

accounts receivable ($1,265M for the three months). (Munson Aff. ¶ 14.) Because Skyline refused to provide the auditor with its general ledger, the auditor was not able to determine if this cash was being received into other Skyline bank accounts or being diverted from Skyline altogether. (Munson Aff. ¶ 15.)

37. The auditor also observed that some of the financial statements provided to him during the audit appeared to be prepared without compliance to GAAP as the general principle of balancing two sided entries (debits must equal credits) did not appear to have been complied with, and provided balance sheets and income statements were not supported by general ledger details or reconciled retained earnings rollfoward. (Munson Aff. ¶ 18.)

38. The auditor further found that expenses and liabilities appeared to be under-recorded, most notably for the month of January 2014 with regard to real estate taxes, liability insurance, management fees, depreciation and amortization and interest expense. (Munson Aff. ¶ 19.) When confronted with this finding, Mr. Bartle indicated that he did not know if these balances were under-recorded and that he would have to check with Ms. Wadman-Huth before he could comment. (Munson Aff. ¶ 19.) In the auditor's opinion, this answer was either an attempt to delay providing a response or an indication that Mr. Bartle did not have an intimate understanding of either accounting or Skyline's financial statements. (Munson Aff. ¶ 19.)

39. These discrepancies, along with further analysis performed on recorded cash, accounts receivable and retained earning balances and reconciliations, led the auditor to question whether Skyline's financial statements comply with GAAP standards or are reasonably stated. (Munson Aff. ¶ 16.) The discrepancies also led the auditor to conclude that either: (i) Skyline lacks a professional working grasp of its accounting records or (ii) Skyline does not want Oxford

11

to see its books and records because the financial reports provided to Oxford do not reconcile with Skyline's general ledger. (Munson Aff. ¶ 16.)

### G. HISTORICAL ALLEGATIONS AND FINDINGS OF DISHONESTY AND WRONGDOING BY MR. BARTLE.

40. The auditor's report was particularly disturbing to Oxford in light of Mr. Bartle's past admissions of intentional diversion of Oxford's funds, as well as, historical allegations and findings against him in lawsuits across the country, including:

- Intentionally concealing over $1 million in income in direct violation of a court order that required him to submit monthly sworn statements of his income to the United States (*In re John Bartle*, No. 05-00564 (S.D. Ind.) United States' Motion to Appoint Chapter 11 Trustee at 2-3, 13-15, Exhibit CC);

- Failure to pay over $7.5 million in Federal Insurance Contributions Act (FICA) taxes over to the government after the tax amounts were withheld from wages of the employees of several of his related companies and income taxes. (*U.S. v. Bartle*, No. 08-cv-0043 (S.D. Ind.), Compl. ¶¶ 3-7, Exhibit DD)

- Using funds from companies over which he had control to pay the funds he owed to the United States for tax debt (*In re John Bartle*, No. 05-00564, Motion to Appoint Chapter 11 Trustee, at 2-3, 13-15, Exhibit CC);

- Using funds from companies over which he had control to pay credit card bills for his family's personal expenses, including over $500,000 charged to the cards by his daughters (*In re John Bartle*, No. 05-00564, Motion to Appoint Chapter 11 Trustee, at 2-3, 13-15, Exhibit CC);

- Concealing information related to a case from the court *Lock Realty Corp. IX v. U.S. Health, LP*, 2006 U.S. Dist. LEXIS 73498 *8 (N.D. Ind. Sept. 25, 2006) (the court found that Mr. Bartle was using his 83 entities from sheltering the overall enterprise from liability), Exhibit C);

- Using funds from companies over which he had control to pay the debts of other companies over which he had control (*Bartle v. Jackson St. Investors*, LLC, 2012 Ind. App. Unpub. LEXIS 1638 *4-6 (Ind. Ct. App. 2012), Exhibit EE); and

- Transferring Skyline funds to entities related to Mr. Bartle and other members of Skyline's board of directors, using Skyline's payroll to send payments to Mr. Bartle's family members and refusing to provide financial information to the only board member not appointed by Mr. Bartle (*Skyline Manor, Inc. v. Rynard, et al.*, Dist. Ct. Douglas County, NE, No. 13-1073, Compl. ¶¶ 21-24, 32, Exhibit FF.)

41.  Skyline's board of directors is also entangled in a lawsuit amongst themselves. (*Skyline Manor, Inc. v. Rynard, et al.*, Dist. Ct. Douglas County, NE, No. 13-1073, Compl. ¶¶ 21-24, 32, Exhibit FF.)  The lawsuit is premised upon the refusal of a majority of Skyline's board to provide financial information to a requesting board member.  (*Id.*)  The lawsuit is currently on appeal before the Nebraska Supreme Court.  (*Skyline Manor, Inc. v. Rynard, et al.*, No. 13-0875 (Neb.).)

**H.    OXFORD NOTICES A UCC SALE AND SKYLINE FILES FOR BANKRUPTCY.**

42.  After over a year of continual defaults under the Loan Agreements and numerous unfulfilled promises of replacement financing, Oxford was left with no choice but protect its rights and the well-being of the residents of the Healthcare Facility.  (Somerset Aff. ¶ 42.)  Oxford noticed a UCC foreclosure sale on all of Skyline's personal property.  (Notice of Public Sale of Collateral Under Nebraska Uniform Commercial Code, Exhibit GG.)

43.  On May 8, 2014, the eve of the scheduled UCC foreclosure sale, Skyline filed a voluntary chapter 11 petition for relief under the Bankruptcy Code.

44.  As of the date hereof, no trustee, examiner or statutory committee has been appointed in this case and Skyline continues to enjoy its status as a debtors-in-possession.

### BASIS FOR RELIEF REQUESTED

**A.    THE LEGAL STANDARD FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE.**

45.  A chapter 11 trustee shall be appointed if the court finds cause for such appointment or if such appointment is in the best interest of creditors.  Section 1104(a) of the Bankruptcy Code reads, in relevant part, as follows:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, after notice and a hearing, the court shall order the appointment of a trustee—

13

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause ...;

(2) if such appointment is in the best interests of creditors, any equity security holders and other interests of the estate ....

11 U.S.C. § 1104(a).

46.     While the presumption in chapter 11 cases is that current management is generally best suited to orchestrate the process and the appointment of a chapter 11 trustee is typically considered an extraordinary measure, "[t]he willingness of Congress to leave a [debtor] is premised on an expectation that [debtor] can be depended upon to carry out the fiduciary responsibilities of a trustee." *In re Marvel Entm't*, 140 F.3d 463, 474 (3d Cir. 1998) (quoting *In re Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989). If the debtor cannot be depended on to carry out the fiduciary duties, "section 1104(a)[] commands that the stewardship of the reorganization effort must be turned over to an independent trustee." *Marvel Entm't*, 140 F.3d at 474 (quoting *Savino Oil*, 99 B.R. at 526).

47.     "[T]he appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." *In re Intercat*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000).

48.     Oxford, as the moving party, bears the burden of proof under a preponderance of evidence standard. *Keeley & Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land P'ship)*, 455 B.R. 153, 163 (8th B.A.P. Cir. 2011).

**B.     THE COURT MUST APPOINT A CHAPTER 11 TRUSTEE BECAUSE CAUSE EXISTS TO DO SO.**

49.     If cause exists to order the appointment of a trustee under section 1104(a)(1) of the Bankruptcy Code, the Court has no discretion and must order the appointment of a chapter 11 trustee. *See, e.g., Keeley*, 455 B.R. at 163; *Savino Oil*, 99 B.R. at 525 ("The sole question

presented in a [s]ection 1104(a)(1) motion is whether the acts or omissions of current management, whether committed before or after the filing of the Chapter 11 petition, supply the 'cause,' as defined, to trigger the appointment of a trustee."). "Once the court has found that cause exists under § 1104(a)(1), there is no discretion; an independent trustee must be appointed." *Savino Oil*, 99 B.R. at 526.

50.    The list of incidents of "cause" for which a chapter 11 trustee must be appointed under section 1104(a)(1) of the Bankruptcy Code is not exhaustive. *See Marvel Entm't*, 140 F.3d at 471; *In re Bellevue Place Assoc.*, 171 B.R. 615, 622-23 (Bankr. N.D. Ill. 1994). In addition to fraud, dishonesty, incompetence and gross mismanagement, courts have found cause to appoint a trustee based on the following other factors:

    (i)    materiality of the misconduct;

    (ii)    evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;

    (iii)    the existence of pre-petition voidable preferences or fraudulent transfers;

    (iv)    unwillingness or inability of management to pursue estate causes of action;

    (v)    conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;

    (vi)    self-dealing by management or waste or squandering of corporate assets;

    (vii)    the overall management of the debtor, both past and present;

    (viii)    the trustworthiness of the debtor's management;

    (ix)    the nature of and availability of financial records; and

    (x)    the movement of funds between the debtor and related entities.

*See, e.g., Keeley,* 455 B.R. at 163 (citing *In re Veblen West Dairy LLP*, 434 B.R. 550, 553 (Bankr. D.S.D. 2010)).

51. Just one of these clear examples of "cause" compels the appointment of a chapter 11 trustee. In addition, the court may also consider the totality of the circumstances, *i.e.*, the cumulative or collective impact of the alleged problems or issues, in making its decision. *In re Cardinal Indus., Inc.*, 109 B.R. 755 (Bankr. S.D. Ohio 1990).

52. Here, it is clear Mr. Bartle makes the decisions on behalf of Skyline. Mr. Bartle's prepetition dishonest, incompetent and improper management of Skyline, singularly and in the aggregate, constitutes cause to appoint an independent trustee under section 1104(a)(1).

53. Mr. Bartle admitted to intentionally diverting funds from Oxford. There is evidence from Oxford's independent auditor that the diversion is likely still taking place, but, because of Skyline's refusal to allow Oxford to review Skyline's books and records or appoint a new trustworthy manager, such diversion cannot be confirmed. Skyline's admitted history of diverting funds paired with its failure to employ an independent account and its refusal to allow access to its books and records pose great risk to Oxford and all other creditors of Skyline. Moreover, as determined by the independent auditor, Skyline's concealment of its records is likely meant to keep Oxford and others from detecting its financial mismanagement or is a result of incompetent financial bookkeeping. This estate is also at risk in light of numerous allegations and findings against Mr. Bartle and Skyline of submitting false reports to the United States, concealing income, concealing information from courts of law, self-dealing by management, squandering corporate assets by transferring them among Mr. Bartle's related entities (which could very well be happening here as a result of the payments made on behalf of Skyline from Americare and BVM).

54. All of these acts constitute "cause" for the appointment of a chapter 11 trustee under section 1104(a)(1) of the Bankruptcy Code. *See, e.g., In re The McCordi Corp.*, 6 B.R.

16

172, 177 (Bankr. S.D.N.Y. 1980) (finding that appointment of chapter 11 trustee was mandated based on evidence that debtor has been guilty of fraud and dishonest conduct in its dealings with its sole secured creditor, by kiting checks and obtaining overdraft advances to which it was not entitled); *Intercat*, 247 B.R. at 923 (chapter 11 trustee appointed due to debtor's fraud toward creditors, including debtor's failure to disclose information that it was contractually obligated to disclose); *Fukutomi v. United States Trustee (In re Bibo, Inc.)*, 76 F.3d 256, 258 (9th Cir. 1996) (failure to observe fiduciary duties to creditors constituted fraud and cause to appoint a chapter 11 trustee).

C. **APPOINTMENT OF AN INDEPENDENT TRUSTEE IS NECESSARY TO PROTECT THE INTERESTS OF CREDITORS AND OTHER INTERESTS OF THE ESTATE.**

55. In this Chapter 11 Case, section 1104(a)(1) requires an order directing the appointment of a trustee, but, even if it did not, the Court should exercise its discretion to order the appointment of a trustee because such appointment is necessary to protect the interests of creditors and other interests of the estate under § 1104(a)(2).

56. "Courts construing this subsection [1104(a)(2)] 'eschew rigid absolutes and look to the practical realities and necessities' of the record to determine whether the appointment of a trustee is in the best interests of the estate." *Taub v. Taub (In re Taub)*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010) (quoting *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006). "Unlike § 1104(a)(1), § 1104(a)(2) does not require a finding of fault; the court may appoint a trustee even if no 'cause' exists. The Court has broad discretion, and at bottom, 'it seems that § 1104 reflects practical reality that a trustee is needed." *In re Euro-American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) (quoting *Savino Oil*, 99 B.R. at 527 n.11).

17

57. "The factors constituting a basis for appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a great deal of judicial discretion." *Savino Oil*, 99 B.R. at 527 n.11. Courts have used the following factors to determine whether a trustee should be appointed under § 1104(a)(2): "(i) trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence— or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *Euro-American Lodging*, 365 B.R. at 427 (quoting *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

58. As detailed above, Mr. Bartle is not trustworthy. He admitted to intentionally diverting funds from Oxford. He has repeatedly refused to recognize Oxford's attempts to exercise its fair rights under the loan agreements. Not only has he failed to pay his agreed upon obligations under the loan agreements, he has concealed Skyline's books and records. He does not have an independent account. As a result of his veil over Skyline's books and records there is no way for an independent party to know the truth about his operation of Skyline. In light of the allegations and findings against him in other cases of submitting false oaths, concealing income, concealing information from courts, using funds of one company for another company and using company funds for personal use – Mr. Bartle cannot be trusted to act as a debtor-in-possession.

59. Courts have appointed chapter 11 trustees pursuant to § 1104(a)(2) when there is a high level of acrimony between a debtor and its creditors. In fact, "acrimony between the creditors and the debtor's management, standing alone, has been found to be a basis to appoint a chapter 11 trustee under § 1104(a)(2)." *In re Eurospark Indus., Inc.*, 2010 WL 779551, at * 7

(Bankr. E.D.N.Y. Mar. 3, 2010). A "court may find cause to appoint a trustee for 'acrimony' only on a case-by-case basis, when the inherent conflicts that always exist between the debtor and creditor, [or] when the parties 'begin working at cross-purposes.'" *Marvel Entm't*, 140 F.3d 463, 473-74 (3d Cir. 1998) (quoting *In re Cajun Elec. Power Co-op, Inc.,* 74 F.3d 599, 600 (5th Cir. 1996)).

60. After trying to find a solution with Skyline for over a year, the relationship between Oxford and Skyline has become acrimonious. Mr. Bartle has refused to recognize his agreed upon obligations under the Loan Agreements. And, instead, he has taken every opportunity to attempt to coerce Oxford to surrender its rights under the Loan Agreements and follow his ploys. Indeed, following the filing of this chapter 11 case, Mr. Bartle threatened Oxford that "trying to heavy-hand this Debtor in Omaha is very risky." (Bartle Email 5/10/14, Exhibit HH.)

61. Oxford cannot trust Mr. Bartle, nor should this Court. Moreover, due to Mr. Bartle's history, Oxford is not alone in its opinion of Mr. Bartle. Other courts, the United States, other creditors and those wronged by Mr. Bartle have all formed the same opinion.

62. In sum, the appointment of a chapter 11 trustee will benefit the estate and alleviate all of these concerns and provide the ability to find the most efficient and effective resolution in this case, protect the well-being of the residents of the Healthcare Facility and as well as assure all that they will no longer be subject to Mr. Bartle's dishonest, incompetent and improper management of Skyline.

## CONCLUSION

63. Skyline's conduct, through Mr. Bartle and its board of directors, falls far short of that expected of an estate fiduciary and officer of the Court. They have demonstrated that

19

neither the Court nor creditors can rely on them to discharge fiduciary duties to act in the best interests of the bankruptcy estate as a whole. To protect all interested parties and the integrity of the case, the Court should order the appointment of a chapter 11 trustee.

64. After all, Skyline is a non-profit corporation. Skyline's absentee board of directors and Mr. Bartle have no economic interest in Skyline. There is no good faith basis for resisting the appointment of a chapter 11 trustee in this case.

WHEREFORE, for the reasons stated above and adduced at any hearing on the Motion, Oxford respectfully requests that the Court grant the Motion, appoint a chapter 11 trustee, and grant such other and further relief as is just and proper under the circumstances.

Dated: May 13, 2014

Respectfully submitted;

By:  /s/ Jeffrey Blumel
Jeffrey J. Blumel, #19011
Robert M. Schartz, #20155
Ryan M. Kunhart, #24692
ABRAHAMS KASLOW & CASSMAN LLP
8712 West Dodge Road, Suite 300
Omaha, NE 68114
Telephone: 402-392-1250
Facsimile: 402-392-0816
jblumel@akclaw.com
rschartz@akclaw.com
rkunhart@akclaw.com

-and-

Kenneth J. Ottaviano, Pro Hac Pending
Paige E. Barr, Pro Hac Pending
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone: 312-902-5200
Facsimile: 312-902-1061
Kenneth.Ottaviano@kattenlaw.com
Paige.Barr@kattenlaw.com